## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Cares Community Health | ) |
| | ) |
| *Plaintiff,* | ) |
| v. | ) |
| | ) |
| United States Department of | ) |
| Health and Human Services | ) |
| | ) |
| and | ) |
| | ) |
| Eric D. Hargan, | ) |
| Acting Secretary and Deputy Secretary, | ) |
| United States Department of | ) |
| Health and Human Services | ) |
| | ) |
| and | ) |
| | ) |
| Seema Verma, | ) |
| Administrator of the | ) |
| Centers for Medicare and Medicaid Services | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPLAINT

## INTRODUCTION

1.      This case, brought by plaintiff Cares Community Health ("Cares"),[1] is concerned

with defendants' undermining of the payment right of federally qualified health centers

("FQHCs") under the Medicare Part D Prescription Drug Program ("Part D" or "Part D

program") by failing to comply with provisions of the Medicare Act (Title XVIII of the Social

Security Act, 42 U.S.C. § 1395 *et seq.*)[2] designed to protect that right.

---

[1] Cares currently does business under a different name: "One Community Health."

[2] Administration of the Medicare Act and its several programs (including Part D) is the
responsibility of the U.S. Department of Health and Human Services ("HHS").  Within HHS,

2.      The right at issue in this case is the amount entities labeled by the Medicare Act as "federally qualified health centers" are entitled to receive for the services their pharmacies provide under the Part D program.  CMS is bound by the Part D provisions of the Medicare Act to protect the FQHC payment right through a requirement that must be placed in all contracts CMS enters into for Part D services (with health insurers or other entities that become responsible for making arrangements with pharmacies to fill the prescriptions of Part D beneficiaries).  The requirement is that those contracts must specifically require Part D contractors to pay FQHCs at a "level and amount that is *not less than* the level and amount the Part D contractor would make" if the services were being provided by an entity other than an FQHC.  42 U.S.C. § 1395w-27(e)(3) (emphasis added); *see* 42 U.S.C. § 1395w-112(b)(3)(D) (incorporating the FQHC payment requirement into provisions governing Part D contracts with Prescription Drug Plans ("PDPs"))[3].

3.      CMS has not complied, and does not comply, with the foregoing requirement.  Its Part D contracts have no terms (beyond a general incorporation of all applicable provisions of federal law and regulation) that describe, much less enforce, the FQHC payment requirement.

4.      Cares is an FQHC, which, through its retail pharmacy, participates in Part D.  The Part D contractor to CMS with which Cares has its contract to provide Part D services pays Cares less than it does for other non-FQHC entities' pharmacies performing the same services.  The Part D contractor's contract with CMS does not include a term that states the FQHC payment requirement as required by § 1395w-27(e)(3).  Officials of the Part D contractor have

responsibility for the Medicare (and Medicaid) Act's programs has been delegated to the Centers for Medicare and Medicaid Services ("CMS").

[3] The nature of FQHCs and the laws referred to in this paragraph establishing those entities' Part D payment rights are described below.  Weaving through the description is Congress' concern that FQHCs be fully compensated for their services to beneficiaries of Medicare, Medicaid, other federal programs and private health insurers.

2

claimed to Cares representatives that they were unaware of the FQHC payment requirement until a Cares' attorney called it to their attention.  Despite the Part D contractor's having been made aware of the requirement, it has not changed its payment to Cares to the amounts the "not less than" payment requirement binds Part D contractors to pay.

5.     The significance of CMS' failure to issue contracts stating the FQHC payment requirement lies not just in the breach of a mandatory duty that Congress, through plain and unambiguous language, has imposed, but also in the purpose of the pay "not less than" provision. That purpose, which is reflected in the earlier development of FQHC payment protections in provisions of law governing the Medi*caid* program, was and is to ensure that in contracting with FQHCs to provide services to Medicaid (and now Medicare) beneficiaries, payments for those services would be at levels that would not, in effect, subsidize those two programs rather than fully compensate the FQHCs.  Such a result would, for most FQHCs, which also are grantees of Section 330 funds under the Public Health Service Act, cause such FQHCs to violate certain requirements of Section 330.  Such violations would, in turn, result in violations of federal appropriations law.  Cares is a Section 330 grantee[4].

6.     Similarly, and as later described, the FQHC payment requirement ensures against violations of law governing, or arising as a consequence of, an FQHC's participation in another Public Health Service Act program that entitles FQHCs to buy significantly discounted prescription drugs for their pharmacies' services to an FQHC's patients.  The purpose of the program is to confer a financial benefit on several "safety net" entities (in addition to FQHCs) made eligible to participate in the program.  To the extent that CMS' failure to issue Part D contracts that contain the FQHC payment requirement has led or would lead Part D contractors

---

[4] The allegations in this paragraph and support therefor (including the Section 330 grant program) are detailed below.

to pay less than the requirement, the drug discount program's financial benefit is or would be unlawfully shifted to such contractors.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper under 28 U.S.C. §§ 1331, 1346 and 1361, and 1651.  The declaratory and injunctive relief (including relief in the nature of mandamus) sought by Cares in this action is authorized by the foregoing sections of Title 28, along with provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551-559 and 701-706, and 28 U.S.C. § 2201.  Venue is proper under 28 U.S.C. § 1391(e).  This case is entitled to priority status under 28 U.S.C. § 1657(a) because of the FQHC statutory payment right at issue and the health services Cares as well as other FQHCs would be able to provide to their needy and uninsured patients with the additional Part D money those FQHCs should receive from their Part D contractors.

## PARTIES

### Plaintiff

8.      Plaintiff Cares Community Health ("Cares") is a non-profit "health center" located in Sacramento, California.  Cares' health center status is derived from the fact that it receives a federal grant under the Section 330 of the Public Health Service Act (codified at 42 U.S.C. § 254b) "health center" grant program.  Its receipt of that grant automatically qualifies it as a "federally qualified health center" (or "FQHC") when it provides services to beneficiaries of the Medicare and Medicaid programs.[5]  *See* 42 U.S.C. § 1395x(aa)(4)(A); 42 U.S.C. 1396(a)(2)(C) and 1396d(*l*)(2)(B).

9.      Section 330 requires its health center grantees to offer its services to all persons within the center's designated medically underserved area regardless of whether those persons

---

[5] Certain other entities also qualify as FQHCs, but Section 330 grantees were and are the vast majority.

can pay for the services they receive.  Consistent with its Section 330 grant, Cares provides a full

range of clinical and non-clinical services to its patients, including pharmacy, medical, dental,

behavioral health, alcohol and other drug ("AOD") counseling, psychiatry, STD/HIV testing,

medical case management, and eligibility assistance.  Likewise, under Section 330, Cares is

obligated to enter into contractual agreements with public programs (including, specifically,

Medicare and Medicaid) and private insurers, under which it receives payments for the services

it provides to those programs' beneficiaries.

## Defendants

10.    The United States Department of Health and Human Services ("HHS") is

statutorily assigned responsibility for administration of the Medicare Act (Title XVIII of the

Social Security Act.  42 U.S.C. § 1395 *et seq.),* under which various "Medicare" programs (*e.g.*

the prescription drug program under Part D of that Act) are authorized.

11.    Eric D. Hargan is the Acting Secretary and Deputy Secretary of HHS.  He is sued

in his official capacity.

12.    Seema Verma is the Administrator of the Centers for Medicare and Medicaid

Services ("CMS").  CMS is the division of HHS to which responsibility to administer the various

Medicare programs has been delegated.  She is sued in her official capacity.

## GOVERNING FEDERAL LAW

### The Medicare Part D Pay "Not Less Than" Requirement

13.    Medicare Part D services are provided by Medicare Advantage program plans or

Part D Prescription Drug Plans ("PDPs") contracted with CMS for such services.[6]  Medicare

---

[6] Entities eligible for and receiving plan contracts are generally referred to as "sponsors" or "plan
sponsors."  The term "sponsor" is designed to apply to CMS contracts with individual plans and
larger entities, typically insurers, which "sponsor" a number of individual plans.  This

Advantage plans provide Parts A and B health benefits to Medicare beneficiaries and also may

offer Medicare Part D benefits (essentially discounted prescription drugs) to such beneficiaries.

Those that do are known as Medicare Advantage Prescription Drug ("MA-PD") plans.

Prescription Drug Plans ("PDPs") for Part D services are also available to any Medicare

beneficiary who is enrolled in a Medicare Advantage plan that does not provide prescription drug

benefits or who is not enrolled in such a plan.

14.     In plain and unambiguous language, federal law mandates the inclusion of the

previously noted FQHC pay "not less than" requirement in any contract between CMS and a Part

D contractor.  The starting point of such federal law is the following:

> Agreements with federally qualified health centers. (A) Payment
> levels and amounts. A [Medicare Advantage][7] contract under this
> section with [a Medicare Advantage] organization *shall require* the
> organization to provide, in *any written agreement* described in
> section 1853(a)(4) [42 U.S.C. § 1395w-23(a)(4)] between the
> organization and a *federally qualified health center*, for a level and
> amount of payment *to the* federally qualified health center that is
> *not less than the level* and amount of payment that the plan for a
> level and amount of payment...would make for such services if the
> services had been furnished by a[n] entity providing similar
> services that was not a federally qualified health center.

42 U.S.C. § 1395w-27(e)(3) (emphasis added).

15.     The above-quoted FQHC payment requirement applicable to Medicare Advantage

was also made applicable to PDPs by 42 U.S.C. § 1395w-112, which imposed a series of

Medicare Advantage requirements on PDPs.  Among such requirements were (at § 1395w-

---

Complaint, for simplification purposes, refers only to plans, but to the extent such plans are not
direct Part D contractors and instead are one of the plans of a sponsor (the signatory to the Part D
contract), the plan reference also applies to any such sponsor.
[7] Under the Medicare Modernization Act ["MMA"] of 2003, Congress expanded the previous
Medicare+Choice program and renamed it "Medicare Advantage."  Pub. L. 108-173, § 201 (Dec.
8, 2003).  The Part D program also was established by the MMA.

112(b)(3)(D)) the contract terms of § 1395w-27(e).  One of those § 1395w-27(e) terms is the above-quoted 27(e)(3).

16.     By virtue of § 1395w-27(e)(3), FQHCs engaged by MA-PDs or PDPs to provide Part D services must be paid at "a level and amount"…"that is not less than" what the MA-PD or PDP would pay to entities other than FQHCs for the same or similar services.

17.     Although (as previously alleged) CMS did not and does not have the FQHC payment requirement in its MA-PD and PDP contracts as statutorily required, CMS (on January 28, 2005, at 70 *Fed. Reg.* 4738) did issue Medicare Advantage regulations on the requirement (codified at 42 C.F.R. § 422.527):

> § 422.527 Agreements with Federally qualified health centers.
>
> The contract between the MA organization and CMS *must specify* that --
>
> (a)  The MA organization must pay a Federally qualified health center (FQHC) a similar amount to what it pays other providers for similar services.
>
> (b)  Under such a contract, the FQHC must accept this payment as payment in full, except for allowable cost sharing which it may collect.
>
> (c)  Financial incentives, such as risk pool payments or bonuses, and financial withholdings are not considered in determining the payments made by CMS under § 422.316(a).[8]

 (Emphasis added).

18.     In summary, with respect to its administration of the Part D program by a direct, specific, and unambiguous command of federal law, CMS has failed to carry out the duty that command imposes.  It may safely be presumed that this duty was imposed because of Congress' concern that unless the FQHC payment requirement was specified in the terms of the contracts

---

[8] Notably, the pay "not less than" statutory language is not repeated in subsection (a); instead it is replaced by "a similar amount."  Obviously, if an MA-PD or PDP paid an FQHC *less* than it paid other Part D providers performing the same or similar services, the statutory pay not less than requirement would be violated.  Subsection (c) applies to Medicare Part B services, not Part D.

Part D contractors had to sign in order to participate in the program, those contractors would pay FQHCs less than other entities and take advantage of the fact that FQHCs had, under the 340B program, purchased the drugs they were "selling" to the Part D plans at the sharply discounted price 340B requires of drug manufacturers.  Congress' concern was justified.  Numerous FQHCs participating in Part D have directly or indirectly advised Cares' representatives that they are receiving payments for services that are less than those being paid to non-FQHC providers. Cares is one such FQHC.

### The pay "not less than" provision in Medic*aid*

19.      The plain meaning and purpose of pay "not less than" is reinforced by the origins of the phrase and the purpose it serves in Medicaid.

20.      The FQHC pay "not less than" protection came into being in a 1997 amendment to the Medicaid Act as part of changes to Medicaid's then-existing managed care requirements that did away with requirements that had impeded States from utilizing managed care.[9]  It was one part of a larger whole of FQHC payment protections in the Medicaid Act that effectively began in 1998 and 1990.

21.      In 1989 and 1990 an amendment to the Medicaid Act was passed for the purpose of remedying a problem that had plagued the Section 330 health center grant program from its statutory beginnings (in 1975): that health center grant funds would be and/or were being diverted from their congressionally-authorized purpose and, in the process, displacing (and thereby subsidizing) Medicaid, Medicare and other federal health care programs.

---

[9] Medicaid managed care operates similarly to Medicare Advantage.  States (instead of CMS) contract with "managed care organizations" ("MCOs") (and a few other entities eligible for the same type of contracts) to arrange or provide the actual "covered" services to program beneficiaries.

22.     The Ford Administration had opposed the original enactment of the Section 330 grant program (in 1975) because it believed that the program's funds would end up subsidizing services financed under Medicare and Medicaid (and other existing federal health programs).  S. Rep. No. 94-29, at 5 (1975), reprinted in 1975 U.S.C.C.A.N. 469.  In response, Congress placed certain requirements in the 1975 enactment (which continue to exist in today's Section 330). They were as follows.  Each health center had to establish "a schedule of fees or payments for . . . . its services consistent with locally prevailing rates . . . and designed to cover its reasonable costs of operation . . ."[10]  42 U.S.C. § 254b(k)(3)(G)(i).  The payment required by that schedule could be discounted for patients who could not afford the fees.  *Id.*; *see also* § 254b(k)(3)(G)(iii)(I).  But, discounts as against Medicaid, Medicare or "any other public assistance program or private health insurance program" that provides coverage to a particular patient were prohibited.  42 U.S.C. § 254b(k)(3)(G)(ii)(II).  Health center grantees also had to "make every reasonable effort" to collect amounts due under that fee schedule.  Section 330 (k)(3)(F) and (G)(ii)(II), 42 U.S.C. § 254b(k)(3)(F) and (G)(ii)(II).

23.     With the 1975 enactment, the Section 330 program was launched.  Over time it became clear that the efforts required by Section 330 of health center grantees to obtain full payments from other federal (mainly Medicaid) programs were not working and, without something more, would never succeed.  In 1989 (covering only Medicaid) and 1990 (which slightly changed the 1989 Medicaid amendments), Congress amended both the Medicaid and Medicare[11] Acts to require those programs to pay Section 330 health centers 100 percent of each center's reasonable costs of providing services to beneficiaries of those programs.  A good

---

[10] In the event those "prevailing rates" are higher than the health center's reasonable costs, those higher rates are to be charged.
[11] The Medicare amendment was as to Part B.

description of what Congress intended, and why, is within a House report that accompanied

Congress' 1989 Medicaid Act amendment.

> The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally-funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients … To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.
>
> ***
>
> To ensure that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing those services…

H.R. Rep. No. 101-247, at 392-393, *reprinted in* 1989 U.S.C.C.A.N. 2118-19.  The statutory

language ("100 percent of [reasonable and related] costs") was the same as the report.  Omnibus

Budget Reconciliation Act of 1989, Pub. L. No. 101-239, Title VI, Section 6404; 42 U.S.C. §

1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C).

24.     In 1990, Medicaid managed care was extremely limited.  As a result, the effect of

the 100 percent reasonable cost requirement was mainly on State Medicaid programs that then

directly paid providers of Medicaid covered services.  Still, because there was authority in 1990

for States to use managed care, the FQHC 100 percent reasonable cost payment requirement also

was imposed on Medicaid managed care health maintenance organizations ("HMOs") (and

certain other contractors) that in 1990 were the eligible recipients of State Medicaid program

managed care contracts.  Its imposition was made through the addition of a clause (ix) to a list of

clauses under 42 U.S.C. § 1396b(m)(2)(A) that detailed the responsibilities of managed care

contractors.  Referring to a State's contract with a managed care contractor, clause (ix) required that:

> …such contract provides, in the case of an entity that has entered into a contract…with [an FQHC], that (I) rates of prepayment from the State are adjusted to reflect fully the rates of payment specified in section 1396a(a)(13)(E) [the then applicable statutory provision setting the special payment per FQHC service], and (II) at the election of such center payments made by the entity…for services described in section 1396a(2)(C) are made at the rates of payment specified in section 1396d(a)(13)(E).

25.  "Section (a)(13)(E)," the statutory provision governing State payments to FQHCs, required that FQHCs be paid at 100 percent of their reasonable and related costs.  By now, those reading this Complaint may have realized that the Medicaid Act's reference to what in Medicare are "federally qualified health centers" is to "Federally-qualified health centers."  They are one and the same.

26.  Despite clause (ix), managed care contractors (generally HMOs) largely ignored the FQHCs' right to 100 percent reasonable cost payment.  Paying FQHCs by calculating what would be 100 percent of each FQHC's reasonable costs – which, as many had anticipated, resulted (or would have resulted) in paying FQHCs more than other HMO contracted providers – was not something HMOs were prepared or equipped to do.  The requirement was seldom followed.

27.  In 1997, clause (ix) was changed.  The change was part of several amendments to the Medicaid Act made by the Balanced Budget Act ("BBA") of 1997 (Pub. L. 105-33, 111 Stat. 251, Aug. 5, 1997).  The BBA, via the amendment to clause (ix), removed the managed care contractors'[12] financial responsibility to pay the FQHCs rates based on 100 percent of an

---

[12] The BBA also changed the requirements applicable to managed care contractors.  HMOs as the pivotal managed care supplier were replaced by entities defined in § 1396b(m)(1)(A) as

FQHC's reasonable costs.  Amended clause (ix) required MCOs (and other contractors) to pay

FQHCs *not less than* the amount they would pay other than FQHC providers for the same or

similar medical services.  The relevant section of Public Law 105-33 implementing the BBA's

Medicaid amendments to clause (ix) is quoted below.  It is noteworthy that the standard was

implemented in much the same way as the FQHC Medicare Part D pay "not less than"

requirement: under a required clause in the contract (between a State and the MCO) that

specifies the requirement (instead of a contract between CMS and an MA-PD or PDP).

> SEC. 4712. PAYMENT FOR CENTER AND CLINIC
> SERVICES.
> ***
> (2) CONFORMING AMENDMENT TO MANAGED CARE
> CONTRACT REQUIREMENT.—Clause (ix) of section
> 1903m(2)(A) (42 U.S.C. 1396b(m)(2)(A)) is amended to read as
> follows: "(ix) such contract provides, in the case of an entity that
> has entered into a contract for the provision of services with a
> Federally-qualified health center or a rural health clinic, that the
> entity shall provide payment that is *not less than* the level and
> amount of payment which the entity would make for the services if
> the services were furnished by a provider which is not a Federally-
> qualified health center or a rural health clinic" . . .

Pub. L. 105-33, at 258-59 (Jan. 7, 1997) (emphasis added).  Language in the accompanying H.R.

Rep. No. 105-217, at 869 (1997) also is significant.  It describes the payment requirement in the

following way: that "the [managed care contractor] would have to pay the FQHC … at least as

much as it would pay *any other* provider for similar services" (emphasis added).

28.     The statement in H.R. Rpt. 105-217, at 869, that the "not less than" standard is to

be measured against amounts paid to any other than FQHC entity is consistent with the effect of

the BBA's amended clause (ix).  Through clause (ix), the BBA separated the 100 percent FQHC

payment responsibility into two parts: (1) for direct State payments, it remained the same --

---

"managed care organization[s]" ("MCOs").  (Certain other entities remained eligible to receive
managed care contracts.)

payments at 100 percent of costs; and (2) for managed care, the payment responsibility was

divided between managed care contractors and the State.  The States' share was through a

supplemental payment (generally referred to "in the trade" as "wraparound") to an FQHC equal

to the amount by which application of the FQHC's cost-based rate exceeded the payment the

FQHC received from the MCO.  42 U.S.C. § 1396a(bb)(5); H.R. Rep. No. 105-217, at 869

(1997) ("[s]tates would be required to make supplemental payments to the FQHCs" and "[s]uch

payments would be equal to the difference between the contracted amount and the [100 percent]

cost-based amount").

29.     The "catch" in this division of payment responsibility is the amount the MCO

pays.  Since the State pays the balance of the FQHC's reasonable costs after the MCO's payment

to the FQHC, without some standard for the amount the MCO must contribute, the temptation to

MCOs to minimize their FQHC payments would be overwhelming.  The standard the BBA

adopted to ensure that MCOs and other contractors paid their fair share was clause (ix)'s pay

FQHCs "not less than" the contractors pay other entities.  But that standard still could be

manipulated by MCOs.  If, for example, managed care contractors could pick out certain non-

FQHC entities (providing the same or similar services to those of FQHCs) with which they had

contracted at under market rates (even though the vast majority received market rates) and use

those entities with those rates to compute their FQHC payments, they would be able to pay

FQHCs "on the cheap."  The States and HHS/CMS would then have to pay more to FQHCs in

supplemental payments than Congress intended.  The Report language making reference to the

rates paid to any other than FQHC entity shows that such manipulation would be unlawful.[13]

---

[13] From 1989 until 2000, the Medicaid FQHC payment provision remained at 100 percent of a
health center's reasonable costs of furnishing FQHC services.  In December 2000, Congress
changed the Medicaid FQHC payment provision to a cost-related prospective payment system

30.     Regardless of the standard in Medicare or Medicaid for calculating an FQHC's ultimate payment entitlement, when health centers are paid less than federal law requires, they are forced to use funds Section 330 controls to make up the difference. When they do, they are not only left with fewer such Section 330 funds to serve the health care needs of their communities, but they do the very thing Congress has sought for decades to prevent: divert Section 330 funds to subsidize the costs Congress intended other programs to bear.  A Medicare contractor's non-compliance with the Medicare pay "not less than" provision causes the same result.  Section 330 funds will be spent in ways the same Section 330 prohibits.  The result is a clear violation of 31 U.S.C. § 1301(a).

### The 340B Drug Pricing Program

31.     As noted above, the meaning behind and purpose of the Medicare Act's FQHC payment requirement are also tied into the 340B program.  Federally qualified health centers as defined in the Medicaid Act are among several "safety net" entities entitled to purchase discounted prescription drugs.  42 U.S.C. § 256b(a)(4)(A).[14]  The discount program is commonly referred to as "Section 340B," the section of the Public Health Service Act codified at 42 U.S.C. § 256b.  It was passed as part of the Veterans Health Care Act of 1992, Pub. L. 102-585, § 602, 106 Stat. 4943, 4967-4971 (1992).

---

("PPS"), which requires States to reimburse FQHCs at a prospective, or predetermined, rate per patient visit (42 U.S.C. § 1396a(bb)), but left the "clause (ix)" pay "not less than" provision intact.  The per-visit (or PPS) rate is the average of 100 percent of an FQHC's reasonable costs in fiscal years 1999 and 2000.  42 U.S.C. § 1396a(bb)(1)-(5).  The rate is increased each year by an inflation factor and increased or reduced whenever a center changes its scope of Medicaid services on which its per-visit-rate had been based.  New FQHCs have similar requirements under the same § 1396a(bb).

[14] Other entities eligible to participate in the 340B Program include grantees receiving funding under the Ryan White HIV/AIDS Program and several other outpatient health care providers and facilities that receive federal support. 42 U.S.C. § 256b(a)(4).

32.     The Medicare pay *not less than* requirement furthers the purposes of the 340B

program.  That it does so is clear from an explanation of an official of HHS' Health Resources

and Services Administration ("HRSA"), which administers the 340B program, Congress,

through the 340B program,

> …intended to substantially reduce the cost of covered outpatient drugs to 340B-participating eligible entities, known as "covered entities" in order to stretch scarce Federal resources.  340B covered entities are mostly nonprofit health care organizations that have certain Federal designations or receive funding from specific Federal programs, and hospitals meeting criteria specified in law.  Some examples of eligible entities include Federally-Qualified Health Centers (Community Health Centers), Ryan White grantees, hemophilia treatment centers, and critical access hospitals.  These covered entities must apply to participate in the program and once eligibility is confirmed by HRSA the entity can then begin purchasing drugs at the statutorily defined price.

> In Fiscal Year (FY) 2013, these covered entities saved an estimated $3.8 billion on covered outpatient drugs.  Covered entities can only administer or dispense drugs purchased under the 340B program to patients of the covered entity, and 340B drugs can only be administered or dispensed on an outpatient basis.

> While the law does not specify how 340B Program savings must be used, covered entities have indicated that they use the savings to provide more care to more patients and provide medications to those who may not otherwise be able to afford them.  A 2011 Government Accountability Office (GAO) study confirmed this self-reported data.  It found that entities participating in the 340B Program are able to expand the type and volume of care they provide to the most vulnerable patient populations as a result of access to these lower-cost medications.

*Examining the 340B Drug Pricing Program Hearing Before the Subcomm. On Health of the H.*

*Comm. On Energy & Commerce*, 114th Cong. 1-2 (2015) (statement of Diana Espinosa, Deputy

Administrator, Health Resources and Services Administration ("HRSA")) (citation in text

omitted).[15]

---

[15] By creating savings in the purchase of drugs, Congress intended for covered entities to stretch scarce Federal resources to support other facets of the grantee's mission, and to enable those entities to "reach[] more eligible patients and provid[e] more comprehensive services."  H.R. Rep. No. 102-384(II), at 12 (1992).

33.     HRSA also has recognized that if "covered entities were not able to access resources freed up by the drug discounts when they…bill private health insurance, their programs would receive no assistance from the enactment of section 340B and there would be no incentive for them to become covered entities."[16]

34.     The FQHC pay not less than requirement also prevents Part D plans (and Medicaid MCOs) from unlawfully obtaining (in part or whole) the financial benefit 340B is intended to provide to covered entities (FQHCs and others).  In this regard, Section 340B(a)(5)(ii)(B) (42 U.S.C. § 256b(a)(5)(ii)(B)) prohibits covered entities (*e.g.*, FQHCs) from reselling or otherwise transferring a drug purchased *via* 340B authority to a "person who is not a patient of the entity."  The purpose of this prohibition was to ensure that the financial benefit 340B produces for its covered entities cannot lawfully be transferred to anyone other than a covered entity patient.  If and when a Part D contractor pays an FQHC for the FQHC's services less than it pays other entities, it will have caused an unlawful transfer of the 340B discount. Even worse, the party benefitting from that unlawful act will be the same Part D contractor that paid the FQHC less than Part D requires.

## FACTUAL BACKGROUND OF THIS CASE

35     The events that precipitated this action began in September 2009, when Cares entered a Pharmacy Provider Agreement ("Agreement") with the Humana Health Plan, Inc. ("Humana") (an MA-PD) pursuant to which Humana agreed to pay Cares for any "Retail Pharmacy Services" it provided to Humana's enrollees. Under the Agreement, Cares would

---

[16] Health Res. and Serv. Admin., *Hemophilia Treatment Center Manual for Participating in the Drug Pricing Program Established by Section 340B of the Public Health Service Act*, (July 2005), *available at* https://www.hrsa.gov/sites/default/files/opa/programrequirements/forms/hemophiliatreatmentcenter340bmanual.pdf (last accessed December 23, 2017).

participate in Humana's pharmacy network.  The Agreement covered all plans and programs offered by Humana, including, but not limited to, Medicare Part D.

36.     Cares' receipt of Ryan White grant funding at that time qualified it as a "covered entity" eligible to participate in the 340B Program.  42 U.S.C. § 256b(a)(4).

37.     In July 2014, when Cares was first designated an FQHC ("look-alike"), it became eligible to participate in the 340B Program on that basis as well.[17]  Cares is currently registered with the Office of Pharmacy Affairs ("OPA") of HRSA (the HRSA unit responsible for 340B) as a 340B Program covered entity based on its status as a Ryan White Part B participant, a Ryan White Part C participant, a Ryan White Part D participant, and an FQHC.

38.     In December 2014, Humana sent Cares (and approximately 135 other pharmacies in its "network" of pharmacies) an amendment to its Pharmacy Provider Agreement.  The cover letter to the amendment explained that Humana sought to include Cares in its network of 340B dispensing providers and reminded Cares that claims filled with 340B drugs had to be identified as such (using a submission clarification code ("SCC") of "20").  The cover letter stated an effective date of February 1, 2015 for the amendment, and instructed providers who wished to object to the amendment to do so in writing by January 15, 2015.  The amendment provided reimbursement rates for newly defined (by Humana) "340B pharmacy services" that were no different than the services Cares provided under its prior contract, but significantly (over 30 percent) lower than the reimbursement rates for "Retail Pharmacy Services" Cares had been receiving.

---

[17] So-called "look-alikes" are entities that are eligible to receive Section 330 grants, but are not then recipients of those grants.  Such look-alikes qualify as FQHCs under the Medicaid and Medicare Acts.  Cares' FQHC status currently exists based on Cares being a Section 330 grantee.

39.     In January 2015, Cares sent a letter to Humana objecting to the amendment and stating Cares' intent to remain entitled to its payment rates.  The letter provided Humana with background on the 340B program and its importance to Cares and its patients, particularly in terms of the ability to provide comprehensive services to, and preserve continuity of care for, its HIV patients.

40.     In February 2015, Humana notified Cares that Humana was exercising its right to terminate the parties' agreement pursuant to Section 9.9 of the Pharmacy Provider Agreement, which allowed for termination based on the rejection of an amendment to the Agreement. Humana's letter to Cares set the termination date at April 6, 2015.

41.     On March 11, 2015, counsel for Cares wrote to in-house counsel for Humana to explain Cares' position that it could not accept the amendment, as it would shift the benefit of the 340B Program from Cares to Humana.  Cares' counsel explained that Humana's Amendment (by forcing Cares to accept below market reimbursement rates) would frustrate the intent of the 340B program.  Counsel went on to note that the Amendment also would violate the prohibition against Section 330 grantees accepting discounted rates from public programs (*e.g.*, Medicare) and private entities (*e.g.* Humana), and also informed Humana that, as an FQHC, Cares is entitled to receive payment for services furnished to Medicare beneficiaries at rates of at least the same level and amount that Humana paid non-FQHC providers for those services.[18]

42.     After further communications, Humana and Cares reached an agreement under which Humana would treat Cares' claims as subject to the arbitration provision of its Agreement and that Cares could remain a part of Humana's network if it signed the 340B Amendment. Pursuant to a reservation of rights, Cares signed the 340B Amendment on April 1, 2015, and the

---

[18] Cares noted that, if Humana were to terminate its agreement, it would also violate the "any willing pharmacy" provision of Medicare Part D.

340B amendment became effective as to claims for services provided on or after April 6, 2015 (the threatened termination date).

43.     The parties proceeded to arbitration,[19] during which Cares argued that Humana breached its contract with Cares because it had failed to adhere to all applicable federal and state laws, regulations, and guidance, as required by Section 3.3 of the Humana Agreement.  In particular, Cares alleged that Humana violated the FQHC Part D pay "not less than" provision because it had paid and would be paying Cares (an FQHC) at a level and amount that was less than what Humana paid other providers of retail pharmacy services.

44.     After discovery, briefing, and a two-day hearing, the Arbitrator issued a decision. Despite having found, among other things, that the FQHC payment requirement applied to Humana as an MA-PD, the Arbitrator concluded that the ultimate "legal question [of whether Humana was required to pay Cares under the pay 'not less than' standard] require[d] the reconciliation of conflicting policies;" in other words, an interpretation of federal law had to be made and that was something the Arbitrator found was not arbitratable

45.     As of the date of this filing, CMS' form Part D contracts (for use between CMS and MA-PDs plans or PDPs) publicly available through the CMS website fail to contain the mandatory FQHC pay "not less than" term.

46.     Based on information and belief, not only has CMS failed to include the required term in any of its MA-PD or PDP contracts, but also that most, if not all, Part D contractors are violating the FQHC payment provision under their contracts with FQHCs by paying them less than entities that are not FQHCs and are providing the same or similar service.

---

[19] The parties to the arbitration were Cares and Humana Pharmacy Solutions, Inc., the pharmacy benefit managed for several Medicare plans administered by Humana Medicare Advantage Organizations and contracts with pharmacies to provide services covered under such Medicare Plans.

**INJURY**

47.     As an FQHC, Cares has a federal right to payment for the provision of

prescription drug services to Part D plan beneficiaries at a level and amount that is not less than

that which the plan pays other (non-FQHC) pharmacies for the provision of such services.

Congress established and protected that right by requiring the inclusion of a term reflecting the

requirement as a mandatory term of any contract between CMS and a Part D plan.  It may safely

be presumed that Congress passed the requirement that its FQHC pay "not less than" standard

because of concerns that Part D contractors would otherwise not be aware (or on notice) of the

standard.  Despite this requirement and the reasoning behind it, CMS has failed to include the

pay "not less than" term in its Part D contracts and has approved those Part D contracts that

contain no such term.

48.     In the absence of the required FQHC pay "not less than" term in contracts entered

into between CMS and MA-PDs or PDPs, Cares has been and continues to be paid for the

provision of prescription drug services to Part D plan beneficiaries at rates well below those the

plan pays other than FQHC pharmacies for the provision of such services.  These rates are also

below those Cares received prior to Humana's 2015 contract amendment, which, as described

above, reduced the amounts of Humana's payments to Cares for Part D services by more than 30

percent.  And they are well below the rate Cares is paid when it uses more expensive non-340B

drugs in dispenses to Humana plan enrollees.

49.     As of this filing, Cares has lost (and continues to lose) nearly five thousand

dollars ($5,000) of Humana payments per working day as a result of such lower-than-required

rates.  So far, the difference between what Cares should have been paid under the FQHC Part D

pay "not less than" standard and the Part D payments it has received from Humana is approximately $3 million.

50.    By paying Cares roughly $3 million less than Part D law requires, Humana has:

(1)    Violated its Part D contract with CMS, which generally incorporates all Part D legal requirements, including the obligation to pay FQHCs "not less than" what it pays other pharmacies for retail pharmacy services;

(2)    Violated provisions of federal law applicable to FQHC payments;

(3)    Caused a violation of Section 340B's prohibition against transferring the financial benefit of the 340B program to any party other than someone who is the 340B entity's patient;

(4)    Caused a violation of the prohibition in Section 330 against giving discounts to public programs (such as Medicare) or private "insurers;"

(5)    Because of such violation of Section 330's discount prohibition, caused a violation of federal appropriations law by forcing Cares to utilize funds under or controlled by Section 330 to pay costs other than those the statute permits with respect to those funds, and

(6)    Demonstrated the importance of CMS' compliance with its statutory Part D responsibilities to specify the FQHC payment requirement in its contracts with MA-PDs and PDPs.

## CAUSE OF ACTION

**CMS Has Failed to Act as Required by Law**
**(The Administrative Procedure Act, 5 U.S.C. §§ 702, 706)**

51.    The allegations set forth above lead to the following.

52.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559 and 701-706, provides for judicial review to compel agency action if the agency in question unlawfully withheld or unreasonably delayed such action (at § 706(1)) and provides judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action (§ 702).  Under § U.S.C. 552 (13), "agency action" includes an agency's "failure to act."

53.     CMS is responsible for administering the Medicare program.

54.     Federal law prohibits enrollment in a Medicare Part D prescription drug plan unless CMS first enters a contract.  42 U.S.C. §§ 1395w-27(a) and 1395w-112(b).

55.     CMS has a nondiscretionary duty to include certain terms in its contracts with any MA-PD or PDP plan.

56.     Congress unambiguously directed CMS to include in contracts with MA-PDs and PDPs a term that required those entities to pay FQHCs at a "level and amount that is *not less than* the level and amount the plan would make" were the service provided by an entity other than an FQHC.  42 U.S.C. § 1395w-27(e)(3) (emphasis added); *see* 42 U.S.C. § 1395w-112(b)(3)(D).

57.     CMS reinforced this statutory provision by promulgating 42 C.F.R. § 422.527, providing that: "The contract between the MA organization and CMS *must specify* that – (a) the MA organization *must pay* a Federally qualified health center (FQHC) a similar amount to what it pays other providers for similar services" (emphasis added).

58.     CMS has failed to carry out its mandatory duty to include the pay "not less than" requirement in contracts with MA-PD and PDP plans and has entered into contracts that contain

no such FQHC payment protection.  The template contracts CMS has published for MA-PD and

PDPs did not and do not specify the FQHC pay "not less than" requirement.

59.     Accordingly, CMS has acted contrary to law, unlawfully withheld required

agency action, and failed to follow its own rules by omitting a mandatory term in its contracts

with Medicare Advantage organizations and Medicare Part D plans for Part D services.

60.     Cares (as an FQHC) has a right to be paid in accordance with the FQHC pay "not

less than" requirement.

**PRAYER FOR RELIEF**

WHEREFORE, Cares asks this Court to:

1.     Enter judgment in its favor and against defendants HHS, Hargan and Verma;

2.     Declare that such defendants have failed to exercise their nondiscretionary duty to

include the FQHC pay "not less than" term in the Part D contracts it has entered into with MA-

PD and PDP plan sponsors, as required by federal law at 42 U.S.C. §§ 1395w-27(e)(3), 1395w-

112(b)(3)(D), and regulation, at 42 CFR § 422.527;

3.     Enjoin CMS defendants from entering into future Part D contracts with MA-PDs

and PDPs that do not include the required pay "not less than" term required by federal law at 42

U.S.C. §§ 1395w-27(e)(3), 1395w-112(b)(3)(D), and 42 CFR § 422.527;

4.     Order defendants to amend any existing Part D contracts to specify that

agreements between (1) PDPs or MA-PDs and (2) FQHCs provide for payment to FQHCs at a

level and amount that is not less than what the plan would pay other (non-FQHC) providers for

the same service;

5.     Order defendants not to enter into any future Part D contracts that do not specify

the protection;

23

6.      Order defendants to take reasonable steps to call attention to the contract

amendment and to its application to the entire period of the contract;

7.      Order such other relief as the Court deems warranted or just.


Dated:  December 23, 2017                    Respectfully submitted,



/s/ *James L. Feldesman*
**FELDESMAN TUCKER LEIFER FIDELL LLP**
James L. Feldesman (DC Bar No. 023796)
Matthew S. Freedus (DC Bar No. 475887)
David A. Bender (DC Bar No. 1030503)
1129 20th Street, NW, Suite 400
Washington, DC 20036
Tel: (202) 466-8960
Fax: (202) 293-8103
Email: jfeldesman@feldesmantucker.com
Email: mfreedus@feldesmantucker.com
Email: dbender@feldesmantucker.com